Slip Op. 18- 91

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SWIMWAYS CORPORATION,<br><br>                    Plaintiff,<br><br>        v.<br><br>UNITED STATES,<br><br>                    Defendant. | Before: Timothy C. Stanceu, Chief Judge<br><br>Court No. 13-00216 |

## OPINION

[Determining, upon cross motions for summary judgment, the tariff classification of certain swimming pool floats]

Dated:   July 23, 2018

*James R. Cannon, Jr.*, Cassidy Levy Kent (USA) LLP, of Washington, D.C., for plaintiff Swimways Corporation.  With him on the brief were *Jonathan M. Zielinski* and *Heather K. Pinnock*.

*Jamie L. Shookman*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, N.Y., for defendant United States.  With her on the brief were *Chad A. Readler*, Acting Assistant Attorney General, and *Amy M. Rubin*, Assistant Director.  Of counsel on the brief was *Michael W. Heydrich*, Office of the Assistant Chief Counsel, U.S. Customs and Border Protection.

Stanceu, Chief Judge: Plaintiff Swimways Corporation ("Swimways") commenced this

action to contest the denial of its administrative protests by U.S. Customs and Border Protection

("Customs").  Swimways claims that Customs erred in its determination of the tariff

classification of merchandise it imported consisting of various models of "Spring Floats" and

"Baby Spring Floats" designed for the flotation of users (adults, children, and infants) in

swimming pools, lakes, and similar bodies of water.

Before the court are cross-motions for summary judgment.  Concluding that there are no genuine issues of material fact, the court awards partial summary judgment in favor of Swimways.

## I. BACKGROUND

Swimways made various entries of the merchandise at issue in this action between February 2009 and January 2012 at the port of Norfolk-Newport News in Virginia.  Summons (June 3, 2013), ECF No. 1.  In a series of five protests, Swimways contested the determination of tariff classification made upon liquidation by Customs for the merchandise in dispute.[1]  *Id.*

Upon plaintiff's application for further review, Customs issued a headquarters ruling and, on that basis, denied each of plaintiff's protests.[2]  *See* HQ Ruling No. H145739 (Nov. 16, 2012), *available at* https://rulings.cbp.gov/ruling/H145739 (last visited July 18, 2018) ("HQ Ruling").

Swimways initiated this action to contest the denial of its administrative protests on June 3, 2013, Summons, and on June 20, 2013 filed its complaint, Compl. (June 20, 2013), ECF No. 6.  Swimways moved for summary judgment on February 6, 2017.  Pl.'s Mot. for Summ. J. (Feb. 6, 2017), ECF No. 47; *see also* Pl.'s Mem. in Supp. of Mot. for Summ. J. (Feb. 6, 2017), ECF No. 48 ("Pl.'s Mem.").  The United States cross-moved for summary judgment on May 12, 2017.  Def.'s Cross Mot. for Summ. J. (May 12, 2017), ECF Nos. 57 (conf.), 58 (public); *see also* Mem. in Opp. to Pl.'s Mot. for Summ. J. and in Supp. of Def.'s Cross-Mot. for Summ. J. (May 12, 2017), ECF Nos. 57 (conf.), 58 (public) ("Def.'s Mem.").  On June 20, 2017,

---

[1] The five protests involved in this action were filed with the port of Norfolk-Newport News during the period of June 8, 2010 through December 21, 2012.  *See* Summons (June 3, 2013), ECF No. 1.

[2] Protest numbers 1401-11-100257, 1401-12-100333, 1401-11-100410, and 1401-10-100160 were denied on December 7, 2012, while the remaining protest, protest number 1401-12-100522 was denied on January 15, 2013.  *See* Summons.

Swimways filed a response to defendant's cross-motion for summary judgment and its reply in

support of its own motion.  Pl.'s Mem. in Opp'n to Def.'s Cross-Mot. for Summ. J. and Reply

Mem. in Supp. of Pl.'s Mot. for Summ. J. (June 20, 2017), ECF Nos. 60 (conf.), 61 (public)

("Pl.'s Resp.").  On July 24, 2017, defendant filed a reply in support of its cross-motion for

summary judgment.  Reply Mem. of Law in Further Supp. of Def.'s Mot. for Summ. J.

(July 24, 2017), ECF Nos. 66 (conf.), 65 (public) ("Def.'s Resp.").

## II. DISCUSSION

### A. Subject Matter Jurisdiction

The court exercises jurisdiction over this action according to 28 U.S.C. § 1581(a)

(2006),[3] which provides that the Court of International Trade shall have exclusive jurisdiction of

any civil action commenced to contest the denial of a protest under section 515 of the Tariff Act

of 1930, 19 U.S.C. § 1515.[4]

---

[3] All citations to the United States Code herein are to the 2006 edition.

[4] The court is unable to exercise jurisdiction over all of the 143 entries involved in the five protests listed on the summons.  The parties agree that the cause of action as to 67 entries should be dismissed.  *See* Pl.'s Amendment to its June 19, 2017 Opp'n to Def.'s Cross-Mot. for Summ. J. 1-2 (July 18, 2017), ECF No. 64; Reply Mem. of Law in Further Supp. of Def.'s Mot. for Summ. J. 5-6 (July 24, 2017), ECF Nos. 66 (conf.), 65 (public).  Specifically, the parties agree that 10 entries were protested more than 180 days after liquidation, *see* 19 U.S.C. § 1514(c)(3)(A) (requiring a protest be filed within 180 days after date of liquidation), and that 65 entries did not contain merchandise that is the subject of plaintiff's tariff classification claims in the complaint.  Eight of the ten entries that were protested more than 180 days after liquidation also did not contain any merchandise at issue.  Therefore, the judgment issued by the court will effect dismissal as to these 67 entries (i.e., the 10 entries that were protested in an untimely manner plus the 65 entries that did not contain merchandise at issue, less the eight entries that were both untimely protested and that contained no merchandise at issue).  The court, therefore, adjudicates this case on the merits with respect to the remaining 76 entries.

### B. Scope and Standard of Review

Actions to contest the denial of a protest are adjudicated *de novo*.  *See* 28 U.S.C.

§ 2640(a)(1) (directing the Court of International Trade to "make its determinations upon the

basis of the record made before the court").

### C. Awards of Summary Judgment

The court will award summary judgment "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

USCIT Rule 56(a).  In a tariff classification dispute, "summary judgment is appropriate when

there is no genuine dispute as to the underlying factual issue of exactly what the merchandise is."

*Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998) (citing *Nissho Iwai*

*Am. Corp. v. United States*, 143 F.3d 1470, 1472-73 (Fed. Cir. 1998)).  In ruling on a motion for

summary judgment, the court credits the non-moving party's evidence and draws all inferences

in that party's favor.  *Hunt v. Cromartie,* 526 U.S. 541, 552 (1999) (quoting *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  A genuine factual dispute is one potentially affecting the

outcome under the governing law.  *Anderson*, 477 U.S. at 248.

### D. Description of the Merchandise at Issue

The facts set forth below, as obtained from the submissions of the parties, are undisputed,

except where otherwise noted.  *See* Pl.'s Rule 56.3 Statement of Material Facts to Which There

is no Genuine Dispute (Feb. 6, 2017), ECF No. 48-1; Def.'s Resp. to Pl.'s Rule 56.3 Statement

of Material Facts to Which There is no Genuine Dispute (May 12, 2017), ECF Nos. 57-1 (conf.),

58-1 (public); *see also* Def.'s Statement of Additional Undisputed Material Facts

(May 12, 2017), ECF Nos. 57-2 (conf.), 58-2 (public); Pl.'s Resp. to Def.'s Statement of

Additional Undisputed Material Facts (June 20, 2017), ECF Nos. 60-1 (conf.), 61-1 (public).

The court also has examined submitted physical samples of three models and printed images.[5]

    The imported merchandise at issue consists of nine models from the Swimways "Spring

Float" product line and three models from the Swimways "Baby Spring Float" product line.

### 1. The "Spring Float" Product Line

    At issue are nine Spring Float models designed for adults and children.  Three models of

the Spring Float are oval-shaped in outer dimension and are 66 inches long and 40 inches wide.

Each contains an inflatable, polyvinyl chloride ("PVC") bladder that, when inflated with air,

provides flotation for the article.  The bladder is surrounded by a flexible steel rod (referred to as

a "spring") that has been encased in polypropylene tubing.  The spring allows the deflated float

to be folded neatly for storage and transportation and to 'spring' into position when unfolded.  A

second, smaller PVC bladder at one end of the float serves as a pillow for the user when inflated.

The inflatable bladders and the polypropylene-encased spring, which form the oval-shaped

perimeter of the float, are wrapped completely in woven polyester fabric.  A woven elastomer

mesh is stretched flat across the oval-shaped center of the float.  The mesh supports the user

during flotation while also allowing water to flow through the mesh and around the user.  The

three models (the basic "Spring Float," the "Cool Hawaii Spring Float," and the "Photo Prints

Spring Float") are identical in shape, composition, and construction, differing only in that the

latter two models have designs printed onto the textile elements whereas the basic model is

manufactured using textiles that are in solid colors.

---

[5] Two of the three physical samples were submitted in bags that, in addition to
functioning as retail packaging, also aid in transporting and storing the float.  These bags are
made from clear plastic, net fabric, a zipper, and a fabric strap.  The bags do not affect the
classification determination and are classified along with the floats pursuant to General Rule of
Interpretation ("GRI") 5 of the Harmonized Tariff Schedule of the United States ("HTSUS").

The fourth model, the "Spring Float Beach Party with Canopy," has the same shape, construction, and dimensions as the Spring Floats described above but also includes a detachable sunshade (also referred to as a "canopy") that can be attached to the float near the pillow.  The canopy is made primarily from woven polyester fabric and woven elastomer mesh.

Fifth, the Spring Float "Papasan" is roughly circular in shape and is approximately 36 inches in diameter.  Like the models described previously, the Papasan has an inflatable PVC bladder and polypropylene-encased steel spring, both covered in woven polyester fabric.  The Papasan also has a woven elastomer mesh center, but rather than being sewn taut to the polyester fabric that encases the bladder and spring, it is fitted loose to allow the user to sit inside the float rather than on top of it.

Sixth, the Spring Float "SunSeat" is 37 inches by 38 inches.  It also contains an inflatable PVC bladder and a spring, both wrapped in woven polyester fabric.  At one end of the SunSeat is a second inflatable PVC bladder, also wrapped in woven polyester fabric, which functions as a backrest allowing the user to sit in an upright position.  An elastomer mesh panel is stretched flat across the square-shaped center of the float.  The bladder at the perimeter of the SunSeat features a built-in cupholder.

Seventh, the Spring Float "Recliner" resembles an elongated SunSeat.  The Recliner is 55 inches long and 37 inches wide.  Like the other Spring Float models, the bladder is surrounded at the perimeter by a steel spring.  Unlike the other Spring Float models, the Recliner has a bisecting inflatable tube as part of the principal bladder.  The Recliner has a second inflatable bladder that functions as a backrest, allowing the user to sit in an upright position.  The bladders and steel spring are encased in woven polyester fabric.  A woven elastomer mesh fabric panel stretches across one of the two openings formed by the main inflatable bladder and up the

backrest.  The mesh forms a seat for the user.  An open area in front of the mesh seat allows

space for the user's legs to be in the water.  Finally, a cupholder is built into the main bladder.

The eighth model in the Spring Float series, the "Recliner with Canopy," is the same as

the Recliner but with the addition of an attachable canopy made principally from woven

polyester fabric and woven elastomer mesh.

Finally, the "Spring Float Kid's Boat" is a smaller-scale version of the standard Spring

Float, 43 inches long and 29 inches wide.  Like the other Spring Float models, the Kid's Boat is

composed of an oval PVC bladder, a steel spring encased in polypropylene tubing, woven

polyester fabric covering the bladder and spring, and woven elastomer mesh, which on this

model is stretched across the opening in the center of the oval.  The Kid's Boat does not have a

separate bladder that functions as a pillow.  Instead, the tubing of the Kid's Boat widens at one

end to form a pillow or backrest.

## 2. The "Baby Spring Float" Product Line

Before the court are three models of "Baby Spring Floats."  The standard Baby Spring

Float is oval in shape and approximately 34 inches in length and 30 inches in width.  It contains

two separate, oval-shaped inflatable PVC bladders, the outermost of which is surrounded by a

steel spring encased in polypropylene tubing.  Both bladders are covered in a woven polyester

fabric that encloses the bladders and the spring.  The two bladders are connected with polyester

fabric and elastomer mesh.  Attached to the center of the inner bladder is a "seat" made of woven

elastomer mesh in the shape of a half-sphere with two leg holes.  The mesh seat allows an infant

to sit in the Baby Spring Float with the infant's torso at water level.  The packaging for the

sample Baby Spring Float states that the float is for the use of infants between the ages of 9

and 24 months.

The "Baby Spring Float Sun Canopy" is a basic Baby Spring Float that features an attachable canopy made principally from woven polyester fabric and woven elastomer mesh.

The "Baby Spring Float Activity Center" is the same as the Baby Spring Float Sun Canopy except that it is packaged with an inflatable, four-armed "octopus" with arms that hold a rattle, three stacking rings, a teether, and a soft-touch star.

E. Claims of the Parties

Upon liquidation, Customs classified all of the floats at issue in subheading 6307.90.98 ("Other made up articles, including dress patterns: Other: Other") of the Harmonized Tariff Schedule of the United States ("HTSUS"), subject to duty at 7% *ad val*.[6]  Before the court, defendant claims that the floats were liquidated under the correct tariff provision.

Swimways claims that the nine Spring Float models should be classified in subheading 3926.90.75, HTSUS ("Other articles of plastics and articles of other materials of headings 3901 to 3914: Other: Pneumatic mattresses and other inflatable articles, not elsewhere specified or included"), subject to duty at 4.2% *ad val*.

Swimways claims that the three Baby Spring Float models should be classified in subheading 9506.29.00, HTSUS ("Articles and equipment for general physical exercise, gymnastics, athletics, other sports (including table-tennis) or outdoor games, not specified or included elsewhere in this chapter . . . : Water skis, surf boards, sailboards and other water-sport equipment . . . : Other"), free of duty.  In the alternative, Swimways claims that the Baby Spring Floats should be classified in the same provision as the Spring Floats, subheading 3926.90.75, HTSUS.

---

[6] The relevant tariff provisions and duty rates of the HTSUS cited throughout this Opinion were unchanged over the period that the entries at issue were made.

## F. Tariff Classification under the HTSUS

Tariff classification under the HTSUS is governed by the General Rules of Interpretation ("GRIs") and the Additional U.S. Rules of Interpretation, both of which are part of the legal text of the HTSUS.  The GRIs are applied in numerical order, beginning with GRI 1, which provides that "classification shall be determined according to the terms of the headings and any relative section or chapter notes."  GRI 1, HTSUS.  GRIs 2 through 5 apply "provided such headings or notes do not otherwise require."  *Id*.  Determination of the applicable subheading is governed by GRI 6, HTSUS.

GRI 2 states that "[a]ny reference in a heading to a material or substance shall be taken to include a reference to mixtures or combinations of that material or substance with other materials or substances."  GRI 2(b), HTSUS.  Moreover, "[a]ny reference to goods of a given material or substance shall be taken to include a reference to goods consisting wholly or partly of such material or substance."  *Id*.  GRI 2 further provides that "[t]he classification of goods consisting of more than one material or substance shall be according to the principles of rule 3."  *Id*.

GRI 3 states that:

When, by application of rule 2(b) or for any other reason, goods are, *prima facie*, classifiable under two or more headings, classification shall be effected as follows:

(a)     The heading which provides the most specific description shall be preferred to headings providing a more general description.  However, when two or more headings each refer to part only of the materials or substances contained in mixed or composite goods . . . those headings are to be regarded as equally specific in relation to those goods, even if one of them gives a more complete or precise description of the goods.

(b)     Mixtures, composite goods consisting of different materials or made up of different components, and goods put up in sets for retail sale, which cannot be classified by reference to 3(a), shall be classified as if they consisted of the material or component which gives them their essential character, insofar as this criterion is applicable.

(c)     When goods cannot be classified by reference to 3(a) or 3(b), they shall be
        classified under the heading which occurs last in numerical order among
        those which equally merit consideration.

GRI 3, HTSUS.

In cases involving a disputed tariff classification, the court first considers whether "the

government's classification is correct, both independently and in comparison with the importer's

alternative." *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984). Plaintiff has

the burden of showing the government's determined classification to be incorrect. *Id.* at 876. If

plaintiff meets that burden, the court has an independent duty to arrive at "the *correct* result, by

whatever procedure is best suited to the case at hand." *Id.* at 878 (footnote omitted).

"Absent contrary legislative intent, HTSUS terms are to be construed according to their

common and commercial meanings . . . ." *La Crosse Tech., Ltd. v. United States*, 723 F.3d 1353,

1358 (Fed. Cir. 2013) (quoting *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed.

Cir. 1999)). In interpreting the HTSUS, the court may consult the Explanatory Notes ("ENs")

for the Harmonized Commodity Description and Coding System maintained by the World

Customs Organization, which, although not legally binding, "may be consulted for guidance and

are generally indicative of the proper interpretation of a tariff provision."[7] *Degussa Corp. v.*

*United States*, 508 F.3d 1044, 1047 (Fed. Cir. 2007) (citing *Motorola, Inc. v. United States*, 436

F.3d 1357, 1361 (Fed. Cir. 2006)).

---

[7] Citations of the Explanatory Notes ("ENs") in this Opinion are to the fourth edition.
*See* World Customs Org., Harmonized Commodity Description and Coding System
(4th ed. 2007).

G. Tariff Classification of the Spring Floats

The classification of the Spring Floats determined by Customs upon liquidation,

subheading 6307.90.98, HTSUS, is not correct.  The correct classification is that claimed by

plaintiff, subheading 3926.90.75, HTSUS.

1. Classification Cannot Be Determined According to GRI 1 Because the Terms of Neither
Heading 6307 Nor Those of Heading 3926, when Interpreted According to the Relative
Section and Chapter Notes, Describe the Spring Floats in the Entirety

The parties identify as the two competing headings for the Spring Floats heading 6307,

HTSUS ("Other made up articles, including dress patterns") and heading 3926, HTSUS ("Other

articles of plastics and articles of other materials of headings 3901 to 3914").[8]  In considering the

government's classification position, the court first considers whether, as defendant argues, the

Spring Floats may be classified in heading 6307, HTSUS by application of GRI 1, HTSUS.

Accordingly, the court must decide whether the terms of this heading describe the Spring Floats,

when those terms are interpreted in accordance with "any relative section or chapter notes."

GRI 1, HTSUS.  As discussed below, the imported merchandise cannot be classified according

to GRI 1 because neither competing heading describes the Spring Floats.

Heading 6307, HTSUS, which carries the description "[o]ther made up articles, including

dress patterns," is within subchapter 1 of chapter 63.  Subchapter 1 is titled "Other made up

textile articles."  According to note 1 to chapter 63, HTSUS, "[s]ubchapter 1 applies only to

---

[8] The court's own review found no other possible candidate headings.  *See Jarvis Clark Co. v. United States*, 733 F.2d 873, 874 (Fed. Cir. 1984) (holding that the Court of International Trade has an independent obligation to determine the proper tariff classification).  For example, there are various headings applying to articles of steel, but the steel component of the Spring Float, according to the uncontested facts, is but one of several components.

made up articles, of any textile fabric."[9]  Although the Spring Floats are articles with textile

fabric components, they are not correctly described as articles of textile fabric.  Although some

of the components are made of polyester fabric and one component is made of elastomer mesh

fabric, the Spring Floats contain significant components that are not made of a textile material.

The bladder (or bladders)[10] consist entirely of PVC plastic.  The tube that surrounds the spring is

made of another plastic, polypropylene, and the spring itself is made of steel.  The presence of

these significant components causes the court to conclude that the term "made up articles, of any

textile fabric" as used in note 1 to chapter 63, HTSUS does not correctly describe the entire

assembly.[11]

        In support of its GRI 1 argument, defendant maintains that "heading 6307, HTSUS is not

limited to articles made up *entirely* of textile fabric" but rather includes items such as lifejackets

---

[9] Chapters 50 through 63, HTSUS together make up Section XI ("Textiles and Textile
Articles").  Chapter 63, HTSUS ("Other made up textile articles; . . .") applies generally to
articles of textiles that are not goods of Chapters 56 through 62 of Section XI.  *See* Note 2 to
ch. 63, HTSUS.

[10] As detailed earlier in this opinion, all but the Papasan and Kids Boat have two PVC
bladders.  *See* Section (II)(D)(1), *supra*.

[11] Explanatory Note 1 to chapter 63 supports the court's conclusion that the Spring Floats
are not articles of textile fabric, stating in relevant part that:

    The classification of articles in this sub-Chapter [i.e., subchapter 1] is not affected
    by the presence of minor trimmings or accessories of furskin, metal (including
    precious metal), leather, plastics, etc.

    Where, however, the presence of these other materials constitutes **more than**
    mere trimming or accessories, the articles are classified in accordance with the
    relative Section or Chapter Notes (General Interpretative Rule 1), or in
    accordance with the other General Interpretative Rules as the case may be.

EN 1 to Chapter 63.  The bladder or bladders, polypropylene tube, and steel spring are not
accurately described as "mere trimming or accessories."  *See id.*

and lifebelts that it claims are "similar to the goods at issue in this case." Def.'s Mem. 11; *see*

Def.'s Resp. 6-8. Defendant's argument incorrectly relies upon the article description for

subheading 6307.20, HTSUS ("Lifejackets and lifebelts") in a way that impermissibly would

broaden the scope of the terms of the heading. *See* GRI 1 (tariff classification must be

effectuated by the "terms of the headings"); *see also R.T. Foods, Inc. v. United States*,

757 F.3d 1349, 1353 (Fed. Cir. 2014). Lifejackets and lifebelts properly classified under

subheading 6307.20, HTSUS by operation of GRI 1 can be only those that are within the scope

of the terms of heading 6307, HTSUS. As the court has concluded, heading 6307 includes items

that are not made up entirely of textile fabric, but it is not properly interpreted so broadly as to

include goods such as the Spring Floats, which have significant non-textile components that are

not merely trimming or accessories.

The second issue for the court to address is whether the Spring Floats can be classified in

heading 3926, HTSUS ("Other articles of plastics and articles of other materials of

headings 3901 to 3914") by application of GRI 1.[12] Chapter 39 covers "Plastics and articles

thereof." Chapter 39 is divided into two subchapters. The first subchapter ("Primary forms,"

headings 3901 through 3914) covers only plastics in primary forms,[13] while subchapter II

includes articles of plastic ("Waste, parings and scrap; semimanufactures; articles"). The

presence of significant components (i.e., the various polyester fabric components, the elastomer

mesh fabric component, and the steel spring) that are not made of plastic and are not made of

---

[12] Although no party contends that classification of the Spring Floats under heading 3926, HTSUS can be effectuated by GRI 1, HTSUS, the court has an independent obligation to consider whether classification under this heading may be appropriate. *See Jarvis Clark*, 733 F.2d at 874.

[13] "Primary forms" are liquids, pastes, irregular solids, and other bulk forms of plastics. Note 6 to ch. 39, HTSUS.

other materials classified in headings 3901 through 3914 compels the conclusion that the Spring

Floats do not fall within the scope of the terms of heading 3926, HTSUS.

Headings 3926 and 6307, HTSUS each describe "part only" of the materials or

substances in the Spring Floats.  GRI 3(a), HTSUS.  Because no single heading in the HTSUS

describes the Spring Floats in the entirety, these articles cannot be classified in accordance with

GRI 1.  The inquiry, therefore, must proceed according to GRIs 2 and 3.  GRI 3(a) is

inapplicable in this situation because the competing headings must be regarded as equally

specific, with classification effected according to GRI 3(b).

### 2. The Essential Character of the Spring Floats Is Not Imparted by Any Single Material or Class of Materials

In the classification of composite goods consisting of different materials or made up of

different components, GRI 3(b) directs that "classification shall be effected . . . as if they

consisted of the material or component which gives them their essential character, insofar as this

criterion is applicable."  GRI 3(b), HTSUS.  The Explanatory Notes provide helpful guidance for

interpreting GRI 3(b), instructing that "[t]he factor which determines essential character will

vary as between different kinds of goods."  EN VIII to Rule 3(b) of the General Rules for the

Interpretation of the Harmonized System ("GIRs").  Essential character may be determined by

the nature of the "material or component, its bulk, quantity, weight or value, or by the role of a

constituent material in relation to the use of the goods."  *Id*.

Determining the classification of the Spring Float according to GRI 3(b) requires the

court to determine whether there is a "material or component" that imparts the essential character

to the composite good.  The court first considers the question of whether a *material* imparts the

essential character to the whole.

According to the undisputed facts, Spring Floats consist of several different materials,

i.e., they are assembled from various cut-to-shape pieces of polyester fabric, a cut-to-shape piece

or pieces of mesh elastomer fabric, various cut-to-shape pieces of PVC, a PVC inflation valve, a

polypropylene tube, and a steel spring.  When considered together according to weight and

according to value, the percentages representing the fabric components and those representing

the plastic components (although varying somewhat according to the specific model), are such

that neither clearly predominates (the steel material being relatively minor).  *See* Exs. to Pl.'s

Mem. in Supp. of Mot. for Summ. J. at Ex. 4, Bates 1530-31(b), 1540-50, 1571-72

(Feb. 7, 2017), ECF Nos. 51 (conf.), 67 (public) ("Pl.'s Exs.") (affidavit of Edward Hayes and

supporting attachments).

Defendant's GRI 3(b) argument is that the textile materials impart the essential character

to the Spring Floats.  Def.'s Mem. 18-32.  This argument does not succeed because no single

material or class of material so predominates as to impart the essential character to the whole

article.  Each Spring Float contains significant amounts of plastic materials, both in the PVC

bladder or bladders and in the polypropylene tube surrounding the steel spring.  The parties

disagree as to how the textile materials and plastic materials should be compared.  *See* Pl.'s

Mem. 17-19 (stating that plastic components have a higher value and weight than the textile

components); Def.'s Mem. 29 (stating that the application of a different calculation methodology

results in the conclusion that the textile components account for a greater percentage of the cost

of the finished product).  Neither argument as to materials content is persuasive because both the

textile materials and the plastic materials are present in significant, but not clearly predominant,

proportions.  Defendant also argues that the textile materials that are incorporated into the

"canopy or sunshade" should be considered when assessing essential character, but this also is

unpersuasive because there is significant plastic content even in those models that include a

canopy as an accessory.

### 3. The Court Determines Essential Character by Considering the Discrete Components of the Spring Floats

Because the uncontested facts do not allow a conclusion that any single material or class

of materials (i.e., the plastic materials or the fabric materials) imparts the essential character to

these composite goods, the court next considers, as required by GRI 3(b), whether any single

*component* imparts the essential character to the composite good.[14]  As directed by GRI 3(b), the

court is to effect classification according to the component that imparts the essential character,

insofar as this criterion is applicable.  The court concludes that this criterion is applicable

because, according to facts that are not in dispute and as shown by the samples, the various

discrete components contribute different functions to the whole.  Therefore, the court next

considers the respective functions of these discrete components as they contribute to the overall

functioning of the finished article.

The spring assembly, consisting of the steel spring encased by the polypropylene tube, is

one of the discrete components.  Each PVC bladder is also a discrete component, made by

electro-welding cut-to-shape pieces of PVC sheet and incorporating into the assembly the PVC

inflation valve.  For each Spring Float model, there is a PVC bladder that, when inflated with air,

allows for flotation of the device and the user (whether or not a second bladder is also present).

---

[14] An Explanatory Note accompanying Rule 3(b) of the General Rules for the Interpretation of the Harmonized System ("GIRs") states that "[f]or the purpose of this Rule, composite goods made up of different components shall be taken to mean not only those in which the components are attached to each other to form a practically inseparable whole but also those with separable components, **provided** these components are adapted one to the other and are mutually complementary and that together they form a whole which would not normally be offered for sale in separate parts."  EN IX to GIR 3(b).

The woven elastomer mesh component, another discrete component, forms the inside portion of each Spring Float.[15]  It provides essential support for the user in water and, because it is of a mesh composition, allows water to pass through.   Each of these discrete components is complete prior to final assembly, i.e., before being surrounded by the polyester fabric components in a final assembly operation, in which the various cut-to-shape polyester pieces are sewn together to encase the bladders and spring assembly and attached to the elastomer mesh component.  *See* Exs. to Def.'s Cross Mot. for Summ. J. at Ex. 3, 26:1-27:15 (May 12, 2017), ECF Nos. 57-3, 57-4 (conf.), 58-3 (public) ("Def.'s Exs.") (portion of deposition of Edward Hayes describing manufacturing process); *see also* Pl.'s Exs. at Conf. Ex. 4 (video detailing production of a Spring Float).   The polyester pieces also form a component (whether or not considered to be a discrete component) upon final assembly.   At that point in the manufacturing process, these pieces are sewn together to surround the spring assembly and the PVC bladder or bladders and attach to the elastomer mesh component that forms the center of the float.   The polyester pieces serve as the outer surface of the float except for the elastomer mesh portion at the center.

The four components described above (the spring assembly, the PVC bladder that enables flotation,[16] the elastomer mesh component, and the polyester assembly that surrounds the bladder(s) and spring assembly) perform separate functions, as is apparent from the samples and the descriptions provided by the parties.

---

[15] The elastomer mesh component consists of a single piece of elastomer mesh fabric on all Spring Float models except the Papasan, on which it is a sewn assembly of two pieces of this fabric.

[16] The additional bladders perform functions secondary to the flotation characteristic of the larger bladders; specifically, they function as pillows or backrests.

The spring assembly allows for a type of folding of the float for purposes of handling and, as shown by examination of the samples, provides a firmer structure to the article.  As the undisputed facts and the samples show, it does not provide flotation.

The polyester component, by enclosing the bladder or bladders and the spring assembly, and by attaching to the elastomer mesh at the center, is the means by which the entire float is held together as an assembly.  Further, defendant points out that the woven polyester protects the bladder from puncture, "contributes to the Spring Floats' comfortable design," Def.'s Mem. 26, and "prevents consumers from burning themselves or sticking to the inflatable PVC bladder," citing evidence that would establish that the advantage of the polyester outer material over floats made entirely from PVC is a main selling point for these products, *id*. (citing Def.'s Exs. at Conf. Ex. 6, Bates 1860 (market research on how consumers shop for pool floats)).  While the evidence would show that the polyester textile component contributes desirable characteristics to the Spring Floats, it also would show that the polyester component does not impart support for the user, as does the elastomer mesh component or flotation, as does the principal bladder. Therefore, the evidence that would be introduced would preclude a finding that the assembled polyester component imparts functionality comparable to that of the principal PVC bladder or the mesh component.

Because they perform essential functions, the elastomer mesh component and the principal PVC bladder component merit further examination.  The support function provided by the elastomer mesh component is indisputably important.  As defendant asserts and plaintiff does not contest, and as the samples and illustrations show, the float would not function without the elastomer mesh component at the center, as the float would lack the necessary support for the user.  The flotation characteristic imparted by the principal PVC bladder is fundamental to the

functioning of the float and, therefore, at least equally important.  Were there nothing more to be

gleaned from the undisputed facts, the court might conclude from these two essential functions

that neither component can be found to impart the essential character, requiring resort to

GRI 3(c) (determining classification according to the heading that appears last in numerical

order).  However, there is more to consider.

The flotation function of the principal PVC bladder not only is essential to the

functioning of the finished article, but it imparts a defining characteristic that is fundamental to

the commercial identity.  The court does not lose sight of the undisputed facts that this article is a

"float" and that it is the function of the principal PVC bladder to enable the article to float in

water (e.g., a swimming pool or lake).  Moreover, the PVC bladder imparting flotation is a more

complex component to manufacture than is the elastomer mesh component, which is of a single

piece of textile material for all models except for the Papasan, for which it is a sewn assembly of

two pieces of fabric.  The bladder is assembled by welding together the cut-to-shape PVC pieces

and the functional valve.  Def.'s Exs. at Ex. 3, 26:11-27:1; *see* Pl.'s Exs. at Conf. Ex. 4 (video

detailing production of float).  The bladder must be airtight in order for the float to function.

Moreover, through its two-way valve it must allow for inflation of the article prior to use and for

deflation of the article for transport and storage.  Finally, it contributes more to the value of the

finished float than does the elastomer mesh component.  *See* Pl.'s Exs. at Ex. 4, Bates 1540-50

(calculations performed using attachments to affidavit of Edward Hayes).

In addition to arguing that the textile materials impart the essential character, defendant

argues that the uncontested evidence shows that the "user's body is supported by the mesh

panel" and that without this panel the user "would sink through the float's hollow center."  Def.'s

Mem. 20.  This argument is correct as to the function of the elastomer mesh component, but that

component not only is of a different material than the other textile component in the Spring Floats (which is of polyester fabric) but also performs a different function than the polyester component.  The court, therefore, considers it separately with respect to function.

The court concludes that on balance, and in consideration of all the undisputed facts, the essential character determination must be made in favor of the principal PVC bladder component with respect to each of the models of the Spring Float.

### 4. Heading 3926 Is the Correct Heading for the Spring Floats, by Operation of GRI 3(b)

The court is directed by GRI 3(b) to effect classification according to the heading applying to the material or component that imparts the essential character to the composite good. That component, the PVC bladder imparting flotation, consists entirely of welded-together panels and the valve, all made of PVC plastic.  Were the PVC bladder imparting flotation to be classified as a separate article, it would be classified under heading 3926, HTSUS as an article of plastic.  This heading, therefore, is the correct heading for the Spring Floats.

Defendant's second alternative argument, that the Spring Floats are to be classified under heading 6307, HTSUS by GRI 3(c), *see* Def.'s Mem. 32-37; Def.'s Resp. 19, is unpersuasive in asserting that no essential character determination can be made as to the Spring Floats.  As the court has discussed, there is a discrete component that imparts an essential, indeed defining, characteristic to each float (i.e., flotation), is more complex, both in its construction and in its functioning, than the elastomer mesh component, and contributes more to the value of the article than does the mesh component.  GRI 3(c), therefore, is not applicable.

The Customs Headquarters ruling classifies the Spring Floats according to GRI 3(c) using an analysis essentially parallel to defendant's second alternative classification argument.  This ruling may be accorded a level of deference according to its "power to persuade" (even though

defendant prioritizes two other arguments before it).  *United States v. Mead Corp.*, 533

U.S. 218, 235 (2001) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).  In this case,

the classification ruling is unpersuasive because it is incomplete: it fails to consider adequately

whether any component, as opposed to material or class of material, imparts the essential

character to the float.  *See* HQ Ruling 7-8.  In considering whether any component imparts the

essential character, the ruling considered the polyester components and the elastomer mesh

component to be a single component.  *Id.*  This approach was not analytically sound.  As

discussed above, the polyester component and the mesh component are made of different textiles

and perform different functions.  As the samples amply demonstrate, the mesh component, not

the sewn-together polyester panels, performs a critical function, supporting the user in the water.

It is attached to the polyester panels (rather than directly affixed to the principal bladder), but

together with the principal bladder it allows the assembled article to function.  The ruling

concluded that no component imparts the essential character to the good and then proceeded to

Rule 3(c).  The analysis invoking GRI 3(c), HTSUS ultimately is unpersuasive because of the

essential and defining function of the bladder imparting flotation to the article and its user,

because of the complexity inherent in the construction and functioning of that bladder, and

because of the relatively greater value imparted by the flotation bladder than by the elastomer

mesh component.[17]

---

[17] In some respects, this case is similar to *Better Homes Plastics Corp. v. United States*, 119 F.3d 969 (Fed. Cir. 1997), in which the essential character of a shower curtain set consisting of a plastic inner liner, a textile outer curtain, and plastic hooks was held to have been imparted by the plastic inner liner, not the outer textile curtain, based on the functions performed by the plastic inner liner (which kept water inside the shower and also had privacy and decorative functions) and the relatively low cost of the set.  The Court of Appeals for the Federal Circuit rejected the alternative argument of the United States that classification should be effected under GRI 3(c), HTSUS because essential character could not be determined.  *Id.* at 971.

5. Subheading 3926.90.75 Is the Correct Subheading by Application of GRI 6

Finally, the court examines heading 3926, HTSUS for the proper subheading.  *See* GRI 6, HTSUS.  Upon review of the subheadings under heading 3926, HTSUS, the court concludes that none of the specific subheadings in the group 3926.10 to 3926.40 describes the Spring Floats. Therefore, the proper six digit subheading is 3926.90, HTSUS ("Other:") and the correct eight-digit subheading is 3926.90.75, HTSUS ("Pneumatic mattresses and other inflatable articles, not elsewhere specified or included").

H. Tariff Classification of the Baby Spring Floats

The court concludes that plaintiff has met its burden of showing that the classification Customs determined upon liquidation for the Baby Spring Floats, subheading 6307.90.98, HTSUS, is not correct.  The court concludes, further, that the Baby Spring Floats are correctly classified in subheading 3926.90.75, HTSUS.

The Baby Spring Floats are similar in construction to the Spring Floats, consisting of PVC bladders, textile components made of polyester fabric and elastomer mesh fabric, and a steel spring encased in a polypropylene tube.  They are smaller in size than the Spring Floats, and they also differ in having two PVC bladders that provide the flotation function, instead of only one as do the Spring Floats.  These floats are designed to hold an infant (9 to 24 months in age) in an upright position in the water.  Another difference is that the central elastomer mesh component (assembled by sewing together two pieces of elastomer mesh fabric) has two openings for the infant's legs.  Unlike the Spring Floats, the Baby Spring Floats also have elastomer mesh panels that are located between the two inflatable bladders, each of which is surrounded by polyester fabric.

<u>1. Classification Cannot Be Determined According to GRI 1 Because There is No Heading that,
when Interpreted According to the Relative Section and Chapter Notes, Describes the
Baby Spring Floats</u>

The parties identify three candidate headings in which to classify the Baby Spring Floats.

Defendant argues in favor of the classification determined by Customs upon liquidation, which

was under heading 6307, HTSUS ("Other made up articles, including dress patterns").

Plaintiff's principal classification claim for the Baby Spring Floats is under heading 9506,

HTSUS ("Articles and equipment for general physical exercise, gymnastics, athletics, other

sports . . . or outdoor games, not specified or included elsewhere in this chapter; swimming pools

and wading pools; parts and accessories thereof").  In the alternative, plaintiff argues for

classification under heading 3926, HTSUS ("Other articles of plastics and articles of other

materials of heading 3901 to 3914").[18]

The court first must determine whether the government's classification is correct.  *Jarvis*

*Clark*, 733 F.3d at 878.  In doing so, the first issue the court must address is whether, as

defendant argues, the Baby Spring Floats should be classified in heading 6307, HTSUS by

application of GRI 1.  This requires the court to decide whether the terms of this heading

describe the Baby Spring Floats, when those terms are interpreted in accordance with "any

relative section or chapter notes."  GRI 1, HTSUS.

The Baby Spring Floats are not described by the terms of heading 6307, HTSUS for the

same reason that these heading terms do not describe the Spring Floats.  Although the Baby

Spring Floats contain textile components, these floats are not textile articles.  They contain

---

[18] As with the Spring Floats, the court has also conducted its own review of the HTSUS
and has found no other possible candidate headings.  *See Jarvis Clark*, 733 F.3d at 874.

significant components that are of non-textile materials; specifically, they contain a steel spring, a polypropylene tube surrounding the steel spring, and two inflatable PVC bladders.

Similarly, the terms of heading 3926, HTSUS ("Other articles of plastics and articles of other materials of headings 3901 to 3914") do not describe the Baby Spring Floats. Like the Spring Floats, they contain significant components of materials that are not plastics: the steel spring, the polyester fabric that surrounds the inflatable bladders, and the elastomer mesh fabric components.

The heading plaintiff advocates in its primary claim, heading 9506, HTSUS, is within chapter 95.[19] Chapter 95 covers "toys, games and sports equipment; parts and accessories thereof." The article description for heading 9506 contains several terms: "[a]rticles and equipment for general physical exercise, gymnastics, athletics, other sports (including table-tennis) or outdoor games, not specified or included elsewhere in this chapter; swimming pools and wading pools; parts and accessories thereof."

Plaintiff directs the court's attention to two of the heading terms: "articles and equipment for general physical exercise" and "articles and equipment for . . . other sports . . . ." Plaintiff argues that the Baby Spring Float is a "sports training device," the sport being swimming, Pl.'s Mem. 23, and that "[t]he training and exercise function of the Baby Spring Float is evident in its design," *id.* at 24. Plaintiff refers to its exhibits showing that the Baby Spring Float "positions the infant so that its legs are free to kick in the water and its upper body is held above the water" and that it "does not allow the infant to recline, but encourages physical activity and allows an infant to become accustomed to water." *Id.* Further citing exhibits to its summary judgment

---

[19] Chapter 95 is one of three chapters in Section XX. Section XX is titled "Miscellaneous Manufactured Articles." Section XX, HTSUS.

motion, plaintiff states that the Baby Spring Float "is advertised as 'Step 1' in a product line developed by Swimways to train children how to swim" and that "Step 1 is water acclimation." *Id.* at 23 (citing Pl.'s Exs. at Ex. 5, Dep. Ex. 12 (deposition of Anthony Vittone and accompanying exhibits)). "Subsequently, as the child progresses through Step 4, the various flotation products gradually reduce the amount of flotation, which assists the child in learning how to swim." *Id.* "The Swim Steps product line was developed in consultation with swimming instructors and water safety experts." *Id.* at 23-24 (citing Pl.'s Exs. at Ex. 5 (deposition of Anthony Vittone)).

The cardboard insert packaged with the basic Baby Spring Float, a sample of which was provided to the court as an exhibit, describes "the swim steps 3 level program" as consisting of: Step 1, "Water Introduction," which "[h]elps your baby become comfortable in the water, keeping her supported and balanced[;]" Step 2, "Water Exploration," which "[g]ives your child freedom of motion to develop confidence, supporting him as he learns to balance and paddle[;]" and Step 3, "Swim Training," which "empower[s] your child with the Power Swimr™ and the Sea Squirts Swim Assist Vest™." Pl.'s Exs. at Ex. 3 (physical sample of Baby Spring Float). The cardboard insert also states: "Learning to love the water!  Swim Step 1 supports young children as they are introduced to the water, helping them stay comfortable and happy." *Id.*

The court first considers whether, according to the undisputed facts, the Baby Swim Float can be described as an article or equipment for general physical exercise.  Neither the HTSUS nor the Explanatory Notes define the heading terms "articles and equipment for general physical exercise," but according to common and popular meaning, the term "exercise" can mean "[p]ractice for the sake of training or improvement, either bodily, mental, or spiritual."  5 The

Oxford English Dictionary 528 (2d ed. 1989).  More specific to the term "physical exercise" is

the definition of "exercise" as the

> Exertion of the muscles, limbs, and bodily powers, regarded with reference to its
> effect on the subject; *esp.* such exertion undertaken with a view to the
> maintenance or improvement of health.  Often with distinguishing words, as
> ***carriage-, horse-, open air, walking*, etc., *exercise.***

*Id*.

It can be argued that the heading term "[a]rticles and equipment for general physical

exercise" is a provision controlled by use and thereby governed by Additional U.S. Rule of

Interpretation 1(a), HTSUS ("a tariff classification controlled by use (other than actual use) is to

be determined in accordance with the use in the United States at, or immediately prior to, the

date of importation, of goods of that class or kind to which the imported goods belong, and the

controlling use is the principal use") such that classification would depend on a factual

determination of the principal use as established under that rule.  In considering plaintiff's

principal classification claim, the court does not reach the issue of whether to apply Additional

U.S. Rule of Interpretation 1(a), HTSUS because, according to the information included in the

packaging (specifically, the text on the cardboard insert), there can be no genuine factual dispute

implicating that rule.  The cardboard insert establishes that the Baby Spring Float was designed

for a purpose *other than* general physical exercise, and plaintiff identifies no evidence that raises

a genuine issue of material fact on this point.  The intended purpose of the Baby Spring Float,

according to all of the messaging on the packaging, is introducing infants to the water (i.e.,

acclimation) and "helping them stay comfortable and happy."  It is true that the infant's legs are

free to move in the water as the infant sits upright in the float, but the text of the product labeling

refutes any potential finding that the intended purpose of the Baby Spring Float is physical

exercise of an infant's legs.

The undisputed facts also refute the contention that the Baby Spring Float is an article or

equipment for the physical exercise consisting of swimming or for the sport of swimming.

Plaintiff's submissions that would establish that the Baby Spring Float is marketed as an article

for the first step in a three- or four-step program designed so that the child ultimately, after

reduced levels of flotation, learns to swim do not suffice to place the article within the scope of

heading 9506, HTSUS.  The court must classify the article as it is entered, and the equipment

associated with the other steps in the program is not before the court.  Viewed by itself, the Baby

Spring Float is designed and labeled as a product for introducing infants to water.  That is not the

same as swimming or learning to swim.  The physical structure of the Baby Spring Float

supports the court's reasoning, as it is undisputed that the article holds the infant upright, not in a

swimming position.  Pl.'s Exs. at Ex. 1, Bates 1518 (plaintiff's response to defendant's first

interrogatories directed to plaintiff) ("The Baby Spring Float thus positions the infant so that its

legs are free to kick in the water and its upper body is held above the water.").

<u>2. Classification Must Be Determined According to GRI 3(b) Because the Terms of
Heading 6307 and Those of Heading 3926 Describe "Part Only" of the Baby Spring Float</u>

In summary, the court concludes that the Baby Spring Floats do not fall within the scope

of the terms of heading 9506, HTSUS, and are not described in the entirety by the terms of either

heading 6307 or heading 3926 of the HTSUS.  Heading 6307, HTSUS describes "part only" of

the Baby Spring Float (the textile materials or components therein), as does heading 3926 (which

describes the plastic portions of the Baby Spring Float).  Because no single heading describes the

Baby Spring Floats in the entirety, and because headings 6307 and 3926, HTSUS describe parts

of the entire article, the court's inquiry proceeds according to GRIs 2 and 3.  From this point

forward, the court's analysis is the same as that applying to the classification of the Spring

Floats, discussed above.  Accordingly, the court determines classification according to essential

character, as governed by GRI 3(b).

Plaintiff's submissions in support of summary judgment demonstrate that neither the

textile fabric materials nor the plastic materials of the Baby Spring Float clearly predominate by

cost.  *See* Pl.'s Exs. at Ex. 4, Bates 1549-50, 1571-72 (affidavit of Edward Hayes and supporting

attachments).  Additionally, evidence demonstrating the percentage of the weight of the Baby

Spring Float that is constituted by the textile materials does not show that the textile fabric

materials clearly predominate over that of the other materials.  *See id.*  But here again, the

analysis of materials is not the whole analysis the court must conduct according to GRI 3(b),

HTSUS, which directs that classification is to be effected according to the material *or component*

that imparts the essential character to the composite article, to the extent this criterion is

applicable.

Like the Spring Float, the Baby Spring Float has an elastomer fabric component at the

center that performs an essential function by supporting the infant in the float.  But as to the

Baby Spring Float, the support of the user is also performed in part by the inner PVC bladder

("tube").  Pl.'s Exs. at Ex. 1, Bates 1518 (plaintiff's response to defendant's first interrogatories

directed to plaintiff) ("The inner tube hugs close to the baby's torso, tucking under the armpits,

keeping the baby upright.").  Both the inner and the outer PVC tube achieve the essential

function of flotation, and in addition, "[t]he outer tube enhances security and stability, ensuring

that the float does not tumble." *Id.*  The other components, the polypropylene-encased steel

spring and the outer covering formed by the assembled (sewn) polyester panels, perform

significant functions, but here again the sample of the merchandise demonstrates that these

functions are not comparable to the essential, and defining, function performed by the PVC

bladders.  The two bladders also represent a larger share of the value of the finished article than does the elastomer mesh center component.  *See* Pl.'s Exs. at Ex. 4, Bates 1549-50 (calculations based on vendor quotes for the Baby Spring Float).

### 3. Heading 3926 Is the Correct Heading for Classification of the Baby Spring Floats, by Operation of GRI 3(b)

The court is directed by GRI 3(b) to effect classification according to the heading that applies to the material or component that imparts the essential character to the composite good. The PVC bladders consist entirely of PVC plastic, including the valves.  Were the PVC bladders to be classified separately, they would be classified under heading 3926, HTSUS as articles of plastic.  This heading, therefore, is the correct heading for the Baby Spring Floats.

### 4. Subheading 3926.90.75 Is the Correct Subheading for the Baby Spring Floats by Application of GRI 6

The court next examines heading 3926, HTSUS for the proper subheading.  *See* GRI 6. After review of the subheadings under heading 3926, HTSUS, the court concludes that none of the specific subheadings in the group 3926.10 to 3926.40 describes the Baby Spring Floats. Therefore, the proper six digit subheading for the basic Baby Spring Float is 3926.90, HTSUS ("Other:") and the correct eight-digit subheading is 3926.90.75, HTSUS ("Pneumatic mattresses and other inflatable articles, not elsewhere specified or included").

The "Baby Spring Float Sun Canopy," which is a basic Baby Spring Float that features an attachable canopy, is also classified in subheading 3926.90.75, HTSUS, as the attachable canopy, which is not an essential component of the float, does not alter the essential character analysis.

The "Baby Spring Float Activity Center," a Baby Spring Float with an attachable canopy that is packaged with an inflatable four-armed "octopus" designed to hold a squeaker, stacking rings, soft-touch star, and teether requires the court to perform additional analysis to determine

the proper classification.  The inflatable octopus, squeaker, stacking rings, soft touch star, and

teether, although packaged with a Baby Spring Float, are separate items.  The float (with canopy)

and these separate articles do not make up a set put up for retail sale for purposes of GRI 3(b)

because the octopus, squeaker, stacking rings, soft touch star, and teether serve needs or

activities unrelated to that of the float (and canopy) and do not depend on the float for those

activities.  *See* EN X(b) to GIR 3 (instructing that goods put up as a set for retail sale are "put up

together to meet a particular need or carry out a specific activity.").  Accordingly, these items are

classified separately from the rest of the Baby Spring Float Activity Center.  Because they are

articles for amusement, the inflatable octopus, stacking rings, squeaker, and soft touch star are

properly classified as toys under heading 9503, HTSUS ("Tricycles, scooters, pedal cars and

similar wheeled toys; dolls' carriages; dolls, *other toys*; reduced-scale ("scale") models and

similar recreational models, working or not; puzzles of all kinds; parts and accessories thereof")

(emphasis added).

        The teether raises a separate issue.  Customs rulings, which are not binding on the court

but may provide general guidance, address the tariff classification of teethers, explaining that

teethers may have both an amusement function as well as a utilitarian function and in some cases

are classified as toys and in others as utilitarian articles.  *See, e.g.*, HQ Ruling No. H236278

(June 11, 2013), *available at* https://rulings.cbp.gov/ruling/H236278 (last visited July 18, 2018)

(discussing various classification rulings on teethers).  Based on the illustration submitted, the

teether is designed to resemble a cartoon-like fish, which indicates an amusement function.

Here, it is not necessary to determine whether the teether is a toy or a utilitarian article.  If it is a

toy, the octopus and the smaller parts constitute goods classified in the entirety as toys.  If

instead the teether is classified outside of heading 9503, HTSUS according to its utility, then it is

part of a set put up for retail sale consisting of the octopus and the smaller parts.  *See* EN X(a) to

GIR 3 (instructing that a set put up for retail sale has articles *prima facie* classifiable under

different headings).  The inflatable octopus and the other toy articles packaged with it are used in

the same activity, which includes the placing and removing of the toys (and the teether as well)

on the four "arms" of the "octopus"; each of the smaller articles is designed specifically to fit on

any of the four arms.  Because the octopus and the smaller accessories, including the teether, if

not itself classified as a toy, nevertheless are intended for use together as a play activity (even

though the teether has an additional function), they must be classified as a set put up for retail

sale.  It is obvious from the illustration that the toys, including the octopus itself, not the single

teether, would impart the essential character to the set, which is, therefore, classified under

heading 9503, HTSUS.  The subheading is 9503.00.00, HTSUS.  The float (with the attachable

canopy) is not part of this set and, according to the analysis above, remains classified in

subheading 3926.90.75, HTSUS.

### III. CONCLUSION

For the reasons stated above, the court will grant in part, and deny in part, plaintiff's

motion for summary judgment, concluding that the Spring Floats and Baby Spring Floats are

classified in subheading 3926.90.75, HTSUS ("Other articles of plastics and articles of other

materials of headings 3901 to 3914: Other: Pneumatic mattresses and other inflatable articles, not

elsewhere specified or included"), subject to duty at 4.2% *ad val*.  As discussed above, the

inflatable "octopus" and related items packaged with the Baby Spring Float Activity Center are

classified in subheading 9503.00.00, HTSUS.

Also as discussed earlier in this Opinion, certain entries are dismissed from this action.

The court will grant defendant's motion in part, i.e., as to the dismissal of the entries not properly

before the court, and deny it in part.

Judgment will enter accordingly.

 /s/ Timothy C. Stanceu
Timothy C. Stanceu, Chief Judge

Dated:   July 23, 2018
         New York, New York